UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| DAVID A. EMOND, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:10-CV-00490-JD-CAN |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social ) | |
| Security, ) | |
| ) | |
| Defendant. ) | |

## **OPINION AND ORDER**

Now before the Court is David Emond's November 22, 2010, complaint [DE 1] seeking judicial review of the Commissioner of Social Security's final decision denying Emond's disability benefits. The matter is now fully briefed and ripe for adjudication: Emond filed his opening brief on June 10, 2011 [DE 23], the Commissioner responded on September 16, 2011 [DE 28], and Emond replied on October 14, 2011 [DE 32]. Because the Appeals Council failed to consider the additional evidence Emond submitted and the Administrative Law Judge (ALJ) failed to properly articulate his findings with respect to Emond's residual functional capacity, the Court remands this case to the agency for further consideration.

### **I. PROCEDURAL HISTORY**

Emond applied for Social Security Disability Insurance Benefits on March 8, 2006, alleging a period of disability beginning on April 7, 2005 (Tr. 38). His claims were denied initially and on reconsideration, on June 19 and August 16, 2006, respectively (Tr. 38–39). Following a timely request for a hearing, Emond appeared with counsel before ALJ Bryan J. Bernstein on November 21, 2008 (Tr. 165–69). Emond testified at the hearing, as did a

vocational expert (Tr. 165–86). On July 31, 2009, the ALJ issued a decision finding that Emond was not disabled and denying disability benefits (Tr. 11–19). When the Appeals Council denied review on September 23, 2010, the ALJ's decision became the final decision of the Commissioner (Tr. 2–4). Emond then filed this civil action under 42 U.S.C. § 405(g), seeking judicial review of the Commissioner's determination.

## II. FACTS

A. **Medical History**

Before April 2005, David Emond drove tractor trailer trucks for a living. But on April 7, 2005, he lost his right leg when a 10,000 lb. roll of steel fell from his truck and essentially severed the leg (Tr. 155). He was admitted to Spectrum Health Butterworth Hospital in Grand Rapids, Michigan, and stabilized. (*Id.*) On April 11, Terry Enders, M.D., performed an above-knee amputation on Emond's right leg (*Id.*). Emond was discharged from the hospital on April 14 and transferred to Mary Free Bed Rehabilitation Hospital in Grand Rapids and placed under the care of Benjamin Bruinsma, M.D. (Tr. 131). He was discharged from the rehabilitation hospital on April 20 and returned home (Tr. 129). He began outpatient rehabilitation therapy at Memorial Rehabilitation Center in South Bend on May 9 (Tr. 160–61); by mid-May, when he returned to Mary Free Bed in Grand Rapids, he stated that he was very motivated to begin learning to use a prosthesis and a physical therapist assessed "good potential to be an independent ambulator" (Tr. 127).

On June 7, he was seen in South Bend by Paul Desmarais, M.D. (Tr. 116–17). There, Emond reported an occasional cramp sensation, but no real stump pain and no phantom pain. Dr. Desmarais observed that the wound from surgery was well healed and that Emond was ready to begin prosthetic fitting. By the next time he saw Dr. Desmarais on July 26, Emond had received

2

his prosthesis and was "doing very well with that" (Tr. 115). He was not having any pain, but Dr. Desmarais noted that his physical exam showed some difficulty with weight shifting and "a bit of a circumducted gait" (Tr. 115).

By August 23, Emond had met all of his physical therapy goals and was discharged (Tr. 159). That same day, Dr. Desmarais saw Emond for a follow-up and opined that he continued to do well, was basically independent with the leg, and was not having any pain (Tr. 114). Dr. Desmarais also noted that Emond's gait and weight transfer had improved and that he was "not circumducting as much" (Tr. 114), and indicated that Emond could return to work driving trucks, as long as he had a left foot pedal installed (Tr. 114). In September, Emond returned to Grand Rapids for a follow up with his surgeon, Dr. Enders, and at that time had "a bit of an antalgic gait" but was "independent without assistive devices (Tr. 119). In October, at a follow-up appointment with Dr. Desmarais, Emond was doing well and comfortable in his prosthesis (Tr. 113). He had occasional phantom pain, but not other real pain (Tr. 113). Dr. Desmarais opined that Emond could still do a better job of weight transfer and knee flexion and, like Dr. Enders, noted that Emond had "a bit of an antalgic gait" (Tr. 113). At the next follow-up appointment in November, Dr. Desmarais noted that Emond was doing well and anxious to return to work, and released him to return to work without restrictions other than a left-foot pedal when driving (Tr. 111). In March 2006, Dr. Desmarais provided a narrative opinion consistent with his November findings, and opined that Emond was not totally disabled but could function at a high level with only some mild restrictions such as not being in tight corridors or at great height levels and difficulty with ladders and climbing (Tr. 110).

In June 2006, State Agency physician J. Valentine Corcoran, M.D., reviewed Emond's claim file and completed a Physical Residual Functional Capacity Assessment (Tr 100). Dr.

3

Corcoran concluded that Emond could occasionally lift 50 lbs. and frequently lift 25 lbs., and that he could sit for about 6 hours in an 8-hour workday but could only stand or walk for "at least 2 hours in an 8 hour work day" (Tr. 101). Dr. Corcoran also noted that while Emond could walk on his prosthesis without an assistive device, "it would probably irritate the stump and prove to be tiring if claimant tried to work at a job where he was on his feet 6 hours or more" (Tr. 101) Further, Dr. Corcoran concluded that Emond could never climb ladders, ropes, or scaffolds, could only occasionally climb ramps and stairs, stoop, kneel, crouch, or crawl, and could frequently balance (Tr. 102); finally, he needed to avoid exposure to wetness and hazards such as machinery and heights (Tr. 105).

In August 2006, Emond once again saw Dr. Bruinsma in Grand Rapids (Tr. 164). At that time he had "no significant discomfort or skin problems," was independent with sit to stand and ambulated with a stable gait (Tr. 164). When Emond returned a year later, in August 2007, Dr. Bruinsma noted that Emond had lower extremity strength of 5/5 with functional range, was independent donning and doffing his prosthesis, and ambulated with a stable gait (Tr. 163). Dr. Bruinsma also indicated that Emond's prosthesis was not fitting properly due to weight gain and that he was scheduled for casting the next week (Tr. 163). No further medical records indicate any problems with the new prosthesis.

**B.     Administrative Hearing**

At the hearing on November 21, 2008, Emond testified that he was disabled because he had lost his right leg and was unable to continue with his career as a truck driver and that he could not work in a job that required him to stand for long periods of time due to pain in his left hip (Tr. 170). He explained that the pain was in his left hip because he did not feel stable shifting his weight onto his prosthetic right leg and because of periodic adjustments to the length of his

4

prosthetic leg (Tr. 171). He could walk with concentration for about a city block before becoming winded; inclines were okay, but declines required support and slick, icy surfaces were treacherous (Tr. 172). He could bend (but not squat) to lift 20 to 30 lbs from the floor. He could only stand for about 10 minutes at a stretch before he needed to sit (Tr. 178). He could sit, lopsided, for a period of time but needed to get up and moved around when his left side began to hurt (Tr. 173–74). He had been unable to find a job that would permit him to sit or stand at will (Tr. 174).

     The ALJ then asked the vocational expert, Leonard Fisher, Ph.D., to consider an individual who could lift a maximum of 30 lbs, 20 lbs occasionally, 10 lbs frequently, and could only lift from the floor occasionally due to the need to reach an extraordinary posture (Tr. 180). The individual could not do a conventional stoop. Nor could the individual walk for more than a block or 15 minutes, engage in climbing or addressing steep surfaces competitively (Tr. 180). Dr. Fisher testified that such a individual could not return to Mr. Emond's past work, but that there would be other light work he could do in the regional economy, including: parking lot attendant (125), information clerk (100), and electronics assembler (350), as well as several unskilled sedentary positions (500–600) (Tr. 181). When the ALJ inquired about the sitting and standing requirements of those jobs, Dr. Fisher stated that parking lot attendants and information clerks could sit or stand at will, but that although electronics workers have some flexibility, they need to stand about four hours in an eight hour day while carrying out the job (Tr. 182). In response to a query by Mr. Emond's attorney, Mr. Fisher stated that an individual who could only stand for two-hours in an eight hour work day could not do the job of an electronics assembler (Tr. 182). Mr. Fisher further explained that an individual who could only stand two

5

hours could do some light work jobs that required little standing but occasional lifting (Tr. 183–84).

**D.     The ALJ's Decision**

In his written decision, the ALJ described and followed the familiar five step sequential evaluation process. Applying steps one through three, the ALJ found that Emond had not engaged in substantial gainful activity since the date of his accident (step one) and that his above-knee amputation on his right leg was a severe impairment (step two) but did not automatically qualify him for disability benefits (step three) (Tr. 13–14). The ALJ then found that Mr. Emond had the residual functional capacity to lift 30 pounds at a maximum, 20 pounds occasionally, and 10 pounds frequently (Tr. 15). Mr. Emond could not engage in prolonged walking, and could walk at most one block or 200 yards, or for 15 minutes. He could not stoop conventionally and could only retrieve objects from the ground occasionally. He could not climb of engage steep or sloped surfaces (Tr. 14).

To support this RFC finding, the ALJ then discussed Mr. Emond's testimony at the hearing and the medical evidence. The ALJ recounted that Mr. Emond testified that he could not be on his feet for long periods of time—no more than about 10 minutes at a stretch—due to hip and leg pain, fatigue, and lack of stability (Tr. 14–15). And the ALJ acknowledged that these alleged symptoms were consistent with the medically determinable impairment of an above-knee amputation (Tr. 15). The ALJ next reviewed the medical evidence from Mr. Emond's physicians, Dr. Enders, Dr. Desmarais, and Dr. Bruinsma, noting that these physicians indicated Mr. Emond was doing very well and that at Mr. Emond's last visit with Dr. Bruinsma in August 2007, "[n]o complaints of phantom pain or hip pain are recorded" (Tr. 16) While a new prosthesis was scheduled at that point, the lack of further records led the ALJ to assume that a

better fit "was easily accomplished" (Tr. 16). Based on this evidence, particularly the relatively few complaints of pain in the treatment records, the ALJ concluded that Mr. Emond's allegations of limitations due to pain were not supported by the evidence (Tr. 16). The ALJ also stated that the State Agency (Dr. Corcoran) had determined that Mr. Emond retained the capacity to perform a restricted range of medium work activity, but that the ALJ's own RFC finding of a restricted light work activity better accommodated the limitations reported at the hearing and opined by Dr. Desmarais (Tr. 17).

Based on this RFC finding, the ALJ concluded at step four that Mr. Emond was unable to perform his past relevant work as a tractor trailer truck driver (Tr. 17). But at step five, the ALJ determined that Mr. Emond could perform a significant numbers of jobs in the national economy and therefore found the Mr. Emond was not disabled. Although Mr. Emond could not perform the full range of light work—which would have dictated a finding of "not disabled"—the testimony of the vocational expert indicated that he could still perform representative occupations such as a parking lot attendant (125 jobs regionally) and electronics worker (350 jobs regionally), and that the numbers of these jobs would increase tenfold statewide.

### III.  STANDARD OF REVIEW

The ruling made by the ALJ becomes the final decision of the Commissioner when the Appeals Council denies review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). Thereafter, in its review, the district court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a

7

preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Id.* Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). Finally, conclusions of law are not entitled to deference; so, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

When the Appeals Council declines to review a case notwithstanding a claimant's submission of allegedly new and material evidence, "we evaluate de novo whether the Appeals Council made an error of law in applying the regulation; absent legal error, however, the Council's decision whether to review is discretionary and unreviewable." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). And when a claimant submits additional evidence not considered by the Commissioner in reaching his decision, the Court does not consider the evidence in reviewing the decision. *Eads v. Secretary of the Dep't of Health & Human Servs.*, 983 F.2d 815, 817 (7th Cir. 1993). If the evidence is "new and material," however, the Court may remand the

matter so that the Commissioner may consider the material and adjust the decision, if appropriate.

## IV. ANALYSIS

Emond's complaint simply asks the Court to review the administrative hearing and the ALJ's written determination and either reverse the "not disabled" finding or remand the matter for further consideration. In his opening brief, however, Emond also points to evidence not before the ALJ, namely Dr. Bruinsma's September 2009 RFC assessment form. He argues that this evidence is "new and material" and therefore warrants a remand so that the ALJ can consider this evidence and reevaluate the determination, if necessary. The Court concludes both that the Appeals Council erred in failing to consider whether the additional medical evidence that Emond submitted warranted a remand under the pertinent regulations, and that the ALJ's RFC finding was deficient and does not provide an adequate logical bridge between the evidence and his conclusion that Mr. Emond is not disabled.

**A.     The Appeals Council Failed to Consider Dr. Bruinsma's RFC Assessment**

As noted above, the Court may not consider evidence that was not before the ALJ when reviewing his disability determination. *See Eads*, 983 F.2d at 817. But there are three options available to a claimant who has additional evidence that he feels should cause the ALJ to reconsider his decision. One option is to petition the Commissioner to reopen its previous decision. *See* 20 C.F.R. §§ 404.987–404.989; *see also Eads*, 983 F.2d at 817. Another option is to submit the additional evidence to the Appeals Council when requesting review of the case, so that the Appeals Council may determine if it is new, material, and relates to the period before the date of the ALJ's decision, and review the case if it concludes that the new evidence implicates the accuracy of the ALJ's decision. *See id.* § 404.970(b); *see also Eads*, 983 F.2d at 817. The

final option is to submit the additional evidence to the district court upon judicial review, which may order a "sentence six remand," *i.e.* "order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g).

Emond has not asked the Commissioner to reopen his case, but he did submit Dr. Bruinsma's RFC assessment to both the Appeals Council and the Court. It is not entirely clear what he wants the Court to do with this evidence. He alternatively suggests that the Court reverse the ALJ's decision in light of the new evidence, hold that it was error for the Appeals Council to ignore the evidence and remand on that basis, or find that the additional evidence warrants a remand under sentence six of § 405(g). The first alternative is plainly impermissible: the correctness of the ALJ's initial determination depends on the evidence that was before him at the time, and he "cannot be faulted for having failed to weight evidence never presented to him." *See Eads*, 983 F.2d at 817–18.

The second option is more viable, however, and necessitates a remand. Although the Appeals Council has absolute certiorari-like discretion to decline review of an ALJ's decision, it may not ignore its own regulations: if new and material evidence is submitted, and that evidence "relates to the period on or before the date of the [ALJ] hearing decision," the Appeals Council must "evaluate the entire record including the new and material evidence submitted" before deciding whether to review the case. 20 C.F.R. § 404.970. And while an Appeals Council decision not to review a case is an interim, rather than final, order, limited judicial review is available to determine whether the refusal rests on a mistake of law. *See Eads*, 983 F.2d at 817. In this case, the Court has no way to determine whether the Appeals Council's refusal rests on

such a mistake of law because the letter denying review is entirely silent regarding new and material evidence. It is possible that the Appeals Council considered Dr. Bruinsma's RFC assessment and decided either that it was not new and material or that nothing in it undermined the ALJ's decision. But it is also possible that the Appeals Council never even saw the additional evidence, much less considered whether it warranted review of the ALJ's decision—the administrative record, as initially filed, omitted Emond's memorandum to the Appeals Council opposing the ALJ's decision and the attached supplemental evidence. Only after Emond submitted this evidence directly to the Court, *see* DE 18, 21, did the Commissioner himself complete the record with these materials that "were inadvertently omitted from the administrative record" (Supplemental Certification accompanying DE 22).[1] In light of the Appeals Council's apparent failure to evaluate the supplemental evidence, the case must be remanded to the agency for further consideration.

The Court might, however, eliminate this administrative hurdle by concluding that the additional evidence before the Court warrants a remand for consideration under sentence six of 42 U.S.C. § 405(g). To do so, the Court would need to determine that the evidence is new and material and that "there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.* § 405(g). The evidence is certainly material: whether or not it would ultimately carry the day, there is no question that a treating physician's assessment of limitations directly contrary to the ALJ's conclusion raises a "'reasonable probability' that the Commissioner would have reached a different conclusion had the evidence been considered." *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997). Whether the evidence is "new" for

---

[1]And even then, the second page of Dr. Bruinsma's assessment is missing from the supplemental administrative record filed with the Court. *Compare* DE 22 *with* DE 18-2.

sentence six purposes (but not necessarily Appeals Council review) is a more difficult question. There is no doubt that the assessment was "not in existence or available to the claimant at the time of the administrative proceeding." *Id.* But under the case law, a report or evaluation is not "new" if, although prepared after the administrative hearing, its conclusions are "based entirely on evidence that has long been available." *Id.* (citing *Sample v. Shalala*, 999 F.2d 1138, 1144 (7th Cir. 1993). In this case, Dr. Bruinsma indicated that his assessment was "verified by current, objective clinical signs and laboratory tests" (Tr. 194). Yet no record of an examination or other test accompanied the RFC assessment form, so the Court cannot determine whether the assessment is based on evidence already in the record (e.g. the 2006 and 2007 encounters) or on new evidence since the hearing.

The Court need not, however, ultimately decide whether the assessment satisfies the "newness" element of a sentence six remand. Even assuming, *arguendo*, that it does, Emond has not even attempted to demonstrate good cause for failing to ask Dr. Bruinsma to complete a residual functional capacity assessment before the hearing and incorporate it into the record before the ALJ. *See Perkins*, 107 F.3d at 1296. The assessment itself indicates that the limitations its described would have existed since April 7, 2005, and Emond has not explained why he did not get a single RFC assessment from a treating physician, despite several visits and multiple requests for records between March 2006 when he initially applied for disability benefits and July 2009 when the ALJ found him not disabled. As such, Emond is not entitled to a remand under sentence six.

**B.     The ALJ's Determination was Flawed**

Emond also raises several challenges to the ALJ's assessment of his case. Although the Court will remand this case in any event due to the above-mentioned error by the Appeals

Council, the validity of the ALJ's underlying decision may affect the scope of the agency's considerations on remand. Because the Court concludes below that the ALJ failed to articulate a "logical bridge" between the evidence and his conclusions, the Commissioner must revisit this case even if it determines that Dr. Bruinsma's assessment does not warrant review of the ALJ's conclusions.

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability, 20 C.F.R. § 404.1520(a)(4)(i)-(v):

1. Whether the claimant is currently engaged in substantial gainful activity;
2. Whether the claimant has a medically severe impairment;
3. Whether the claimant's impairment meets or equals one listed in the regulations;
4. Whether the claimant can still perform relevant past work; and
5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). In between steps three and four, the ALJ must then assess the claimant's RFC, which, in turn, is used to determine whether the claimant can perform her past work under step four and whether the claimant can perform other work in society at step five of the analysis. 20 C.F.R. § 404.1520(e). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step

five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Emond does not dispute the ALJ's conclusions at steps one though four. Rather, he contends first that the ALJ's RFC was inadequate and that the ALJ's step five analysis was marred by reliance on unreliable testimony by the vocational expert and the wrong Medical-Vocational guidelines. Taking the latter two arguments first, the Court finds no merit to Emond's contentions. First, Emond contends that the vocational expert testified that the positions of parking lot attendant and electronics worker are "essentially sedentary," thus contradicting the agency's classification of those jobs as "light work." But this takes the vocational expert's testimony out of context: he never stated that the jobs in question *were* sedentary positions, but rather explained that they were light work positions despite requiring less standing than the textbook light work position.

Second, Emond claims that the ALJ erred in applying Medical-Vocational Rules 202.14 and 202.21—the guidelines specific to "light," rather than "sedentary" work, and which direct a finding of "not disabled" for an individual of Emond's age who is a high school graduate. Further, he argues that because he allegedly cannot stand for more than ten minutes at a time and is only able to stand for "at least 2 hours in an 8-hour workday" the agency's policies should direct a finding of disabled for at least part of the period of disability: first, Medical-Vocational Rule 201.14 (sedentary work for an individual over 50 who graduated high school) should have directed a finding of disabled since he turned 50; second, Social Security Ruling 83-12 suggests that an individual who is "not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in the seated position) or the prolonged standing or walking contemplated

14

for most light work," is disabled unless a individual has a job that can accommodate these needs or can transfer skills to such a job. *See* SSR 83-12, 1983 WL 31253, at *4. Neither of these claims succeed. Regarding the application of Rules 202.14 and 202.21, the ALJ specifically disclaimed those rules and instead relied on the testimony of the vocational expert regarding the number of jobs available for an individual with Emond's "age, education, work experience and residual functional capacity" (Tr. 18). Moreover, regarding Rule 201.14 and SSR 83-12, the ALJ did not ultimately find that Emond needed to be able to sit or stand at will or that he could only stand for 2 hours in an 8-hour workday. Thus, whether or not the ALJ's step five determination is sufficient turns on the adequacy of his RFC finding.

That RFC finding, however, is not adequate to support the ALJ's decision at step five of the sequential analysis. Emond argues that the ALJ failed to make the function-by-function assessment of his RFC, as required by SSR 96-8p, 1996 WL 374184. Specifically, the ALJ articulated no finding in his written decision regarding the amount of sitting or standing Emond could do either at one time or over the course of the entire day.

The Court agrees. Social Security Ruling 96-8p requires the ALJ to "assess [the claimant's] work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545." Paragraph (b) of § 404.1545 refers to limitations on physical abilities, and specifically lists "certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching) [that] may reduce [the claimant's] ability to do past work and other work." While it may be, as the Commissioner argues, that an ALJ need not necessarily articulate his RFC on a function-by-function basis, and that a narrative discussion is sufficient, *see Knox v. Astrue*, 327 Fed. Appx.

15

652, 657 (7th Cir. 2009) (unpublished disposition), the ALJ's written decision is devoid of *any* finding—narrative or otherwise—regarding the amount of time that Emond could stand or sit, independent of separate limitations on his ability to walk.

It might be argued (though, notably, the Commissioner does not do so) that the ALJ's findings that Emond's "allegations of limitations due to pain are not supported by the evidence" and that "few complaints of pain are reflected in the treatment records" (Tr. 16) amount to a finding that Emond had *no* limitations on his ability to stand. If so, that finding is inconsistent not only with Emond's testimony, which cited not only pain but fatigue and stability as factors limiting his ability to stand, but also with the finding of the state agency physician that Emond could stand at least 2 hours in an 8-hour workday but could not stand six or more hours (Tr. 101). Moreover, such a finding would be unsubstantiated by the evidence altogether: none of the physicians' opinions other than the state agency even discuss how long Emond can stand, and it would have been the ALJ's duty to develop the record if he did not feel the state agency RFC was sufficient. *See Terry v. Astrue*, 580 F.3d at 477. Regardless, the ALJ does not appear to have actually made such a finding. In fact, the ALJ does not even mention this limitation in his written findings, instead stating that "[t]he State Agency has determined that the claimant retains the capacity to perform a restricted range of medium work activity"—despite the fact that medium work (like light work) activity requires standing or walking for 6 hours in an 8-hour workday, *see* Social Security Ruling 83-10, 1983 WL 31251, at *5–6.

This lack of a finding regarding limitations on Emond's ability to stand is fatal to the ALJ's determination at step five that Emond can do other work that exists in significant numbers in the national economy. For example, the vocational expert testified at the hearing that the position of electronics worker—one of the two jobs cited by the ALJ—required standing for

16

more than 4 hours in an 8-hour workday and could not accommodate a sit and stand at will option. And if Emond truly needs the option to sit and stand at will, it is difficult to see how a finding that he is not disabled is consistent with SSR 83-12's discussion of the types of jobs available to such an individual. Absent any discussion by the ALJ of Emond's specific standing limitations, the Court cannot determine whether the ultimate decision is supported by substantial evidence in the record and concludes that the ALJ failed to construct the required logical bridge between the evidence and his conclusions. *See Terry*, 580 F.3d at 475. The case is therefore remanded for further consideration of any limitations on Emond's ability to stand.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Emond's request to remand the ALJ's decision. [DE 1]. Accordingly, the Court now **REMANDS** this case to the Commissioner for further proceedings consistent with this Opinion and Order.

SO ORDERED.

ENTERED:  March 20, 2012

/s/ JON E. DEGUILIO
Judge
United States District Court